UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

TRACIE D. HUMPHREY,                            Civil No. 07-1484 (JNE/FLN)

        Plaintiff,

v.

MICHAEL J. ASTRUE,                    **REPORT AND RECOMMENDATION**
Commissioner of Social Security,

        Defendant.

_____

Terry Graff, Esq., for Plaintiff .
Lonnie F. Bryan, Assistant United States Attorney, for the Government.

_____

Plaintiff Tracie D. Humphrey seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied her application for supplemental security income ("SSI"). This Court has appellate jurisdiction over the claim pursuant to 42 U.S.C. §§ 405 (g). The matter was referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. The parties have submitted cross-motions for summary judgment [#10 and #13]. For the reasons set forth below, it is the Court's recommendation that the Commissioner's decision be affirmed.

## I. INTRODUCTION

Plaintiff filed for SSI on April 25, 2005, alleging that she became unable to work because of her disabling condition on December 25, 2003. (Tr. 53.) The Social Security Administration denied the application initially (Tr. 24.) and on reconsideration. (Tr. 31.) Plaintiff filed a request for a hearing (Tr. 38.), which was held before Administrative Law Judge ("ALJ"), Lyle Olson, on May 23, 2006. (Tr. 12.) At the hearing, Plaintiff testified on her own behalf, and was represented

by Terry Graff.  (Tr. 12.)  Vocational Expert ("VE"), Frank D. Samlaska, also testified at the hearing.  (*Id;* Tr. 323.)

Following the hearing, the ALJ rendered an unfavorable decision dated August 16, 2006, finding that Plaintiff retained a residual functional capacity ("RFC") that rendered her capable of work that existed in significant numbers in the national economy.  (Tr. 21.)  Plaintiff requested a review of the ALJ's decision on September 13, 2006 (Tr. 7-9.), which the Appeals Council denied by letter dated January 20, 2007 (Tr. 4-6.)  The decision of the ALJ thus became the final decision of the Commissioner.

Plaintiff initiated this action in federal court seeking judicial review on March 9, 2007, and moved for summary judgment on July 20, 2007.  Plaintiff argues that the ALJ's finding is not supported by substantial evidence on the record as a whole, because she contends that the RFC determined by the ALJ is not supported by the evidence.  Defendant filed his motion for summary judgment on August 31, 2007.

## II.  STATEMENT OF FACTS

### A.  Background

Tracie Humphrey was born on October 24, 1968 (Tr. 49.) and was 37 years old at the time of the ALJ's determination. (Tr. 21.)  At the date Plaintiff alleges she became unable to work, December 25, 2003, she was hospitalized for methamphetamine use.  (Tr. 127.)  She was rehopitalized for methamphetamine use from January 9, 2004 until January 13, 2004.  (*Id.*)  She was then placed in the hospital from January 2004 until May 2004 because she had symptoms of mood swings and had a substance abuse problem.  (Tr. 127; 229.)  The Plaintiff was also hospitalized from

October 8, 2004 until January 19, 2005 due to her bipolar disorder.  (Tr. 165.)

Plaintiff writes in her disability report that she was employed as a children's activities director at a church from December 2001 until February 2004.  (Tr. 60.)  From May 2004 until September 2004, Plaintiff worked as a telemarketer.  (*Id*.)  From March 2005 until April 2005, she was employed as an office cleaner.  (*Id*.)  Plaintiff stopped working on April 25, 2005 due to her depression.  (Tr. 59.)

Plaintiff has previous work experience as a sales clerk at a cosmetics counter (from 1988 to 1989),  as child monitor at a day care center (1989) and as a customer service representative at an insurance company (1991-1993).  (Tr. 67, 322.)  Plaintiff graduated from high school and earned an associate's degree in computer networking in 2001.  (Tr. 65.)  Plaintiff is divorced and has a daughter who is 13 years old.  (Tr. 161, 270.)

B.     **Medical Evidence**

**1.  Physical Impairments.**

Plaintiff has had two gastric bypass surgeries.  (Tr. 165.)  Incident to those surgeries, she is anemic and has a vitamin B12 deficiency.  (*Id*.)  She receives monthly vitamin B12 injections.  (*Id*.)

**2.  Mental Impairments.**

Plaintiff has been diagnosed with bipolar disorder, manic phase, with psychotic features. (*Id*.)  On December 25, 2003, Plaintiff was hospitalized for methamphetamine use.  (Tr. 127.)  She was rehopitalized for methamphetamine use from January 9, 2004 until January 13, 2004.  (*Id.*)  She was then placed in the hospital from January 2004 until May 2004 because she had symptoms of mood swings and had a substance abuse problem.  (Tr. 127, 229.)  Medical records from this hospitalization are not in the record.

At an appointment with Plaintiff on July 16, 2004, after Plaintiff's first extended hospitalization from January 2004 until May 2004, nurse Lori Brownshield met with Plaintiff and noted that "[o]verall, she has not felt this good in a long time." (Tr. 117.) Plaintiff was directed to continue taking lithium and Seroquel to manage her bipolar disorder. (Tr. 119.) Plaintiff discussed with Brownshield that she was working as a telemarketer and was walking to work because she did not have a car. (Tr. 117.) She told Brownshield that she had cravings, at times, to drink and do drugs because the people she worked with were young and liked to "party." (*Id*.)

Plaintiff met with Dr. Jane Xie on August 16, 2004. (Tr. 127.) Dr. Xie noted that Plaintiff was seeing her today because the court ordered that Plaintiff be monitored by a psychiatrist. (*Id*.) Plaintiff told Dr. Xie that she still has mood swings from time to time. (*Id*.) Dr. Xie reported that Plaintiff is compliant with her medication treatment of lithium and Seroquel. (*Id*.) The Plaintiff had 180 days of sobriety and abstinence prior to a small relapse thirty days prior to the appointment where Plaintiff drank and did methamphetamine. (Tr. 128.) Plaintiff told Dr. Xie she was attending Alcoholics Anonymous meetings every Saturday. (*Id*.) Plaintiff told Dr. Xie that she was working as a telemarketer and that she liked her job. (*Id*.) She told Dr. Xie that she isolates herself from co-workers because they frequently go out to bars, etc., and she does not want to be tempted to use alcohol or drugs. (*Id*.) Dr. Xie recommended Plaintiff stay on her current medications, lithium and Seroquel and Plaintiff was agreeable. (Tr. 129.)

Plaintiff again met with Dr. Xie on August 26, 2004. (Tr. 124.) Dr. Xie noted that Plaintiff was sad about her house burning down. (*Id*.) It was recommended she continue taking the same medications. (*Id*.)

Plaintiff next met with Dr. Xie on September 27, 2004. (Tr. 122.) Plaintiff told Dr. Xie that

she lost her job three weeks before for a personal reason.  (*Id*.)  Plaintiff also told her that her mood

has been stable and that she is taking her medications faithfully.  (*Id*.)  Dr. Xie noted that Plaintiff's

behavior was "odd" and she suggested hospitalization to the Plaintiff but she refused.  (Tr. 123.)

Dr. Xie noted that her behavior was "odd" but not "holdable."  (*Id*.)  When Dr. Xie tried to check

Plaintiff's lithium level, Plaintiff said she was not feeling well and that she would come back

tomorrow morning to get her blood work done.  (*Id*.)  Plaintiff was however agreeable to a urine

drug screen that day.  (*Id*.)

Plaintiff returned to Dr. Xie on October 4, 2004.  (Tr. 120.)  Plaintiff requested medications

to make her more alert because her medications make her sleepy.  (*Id*.)  Dr. Xie described Plaintiff

as being somewhat anxious and guarded.  (*Id*.)  Dr. Xie confronted Plaintiff about phone calls she

had received from Plaintiff's mother and sister a few days prior regarding Plaintiff's odd behaviors.

(Tr. 121.)  Plaintiff denied the odd behavior and told Dr. Xie not to contact her family regarding her

condition.  (*Id*.)  Dr. Xie described Plaintiff's thoughts as being somewhat tangential.  (*Id*.)  Dr. Xie

offered in-patient treatment to the Plaintiff which she refused.  (*Id*.)

On October 8, 2004, Plaintiff was brought to the emergency room at MeritCare Hospital

because she approached a child at Target thinking it was hers and was going to take the child home

with her.  (Tr. 138.)  When Plaintiff was admitted, her lithium level was undetectable, indicating she

had not been taking her medication.  (*Id*.)  Her family stated to the police that they have been

concerned about her somewhat erratic behavior.  (Tr. 133.)  Plaintiff remained at MeritCare Hospital

until October 21, 2004, when she was transferred to another facility for long-term care.  (Tr. 138.)

On October 13, 2004, Plaintiff attended a court hearing and was put on a 90-day commitment.  (Tr.

139.)  On October 18, Plaintiff complained of a headache, which she thought was caused by the

lithium, and requested to cease taking lithium.  (*Id.*)  She also stated that she saw an advertisement for Topamax, which relieves headaches, and that she wanted to try the drug to relieve her headaches. (*Id.*)  She was prescribed Topamax.  (*Id.*)  The staff also noticed that the Plaintiff had a slight hand tremor, another side effect of the drugs she was taking.  (*Id.*)

On October 21, Plaintiff underwent a second commitment hearing and was committed for treatment at the Fergus Falls Regional Treatment Center and she was transferred to that location. (*Id.*)  Plaintiff remained at this center until January 19, 2005.  (Tr. 165.)  In the discharge summary written by nurse Lavonne Beckler, it was reported that when Plaintiff first arrived at the facility, she was "loud, demeaning, yelling and interrupting the staff."  (*Id.*)  She also engaged in excessive exercise and was described as irritable.  (*Id.*)  Because she exercised for hours at a time, Plaintiff developed severe blisters.  (*Id.*)  Plaintiff experienced blurred vision, which was most likely due to her Topamax medication.  (*Id.*)  When her dosage of Topamax was decreased however, the symptoms subsided.  (*Id.*)  It was reported that the Plaintiff was compliant with her medications and that "she improved greatly" to the point where she was not exercising.  (*Id.*)  At the end of her stay, Plaintiff was to the point where "[s]he could sit down and have a good conversation, and she had developed some insight into her mental illness and her need for medications."  (*Id.*)  At the time of her discharge, it was noted that her attention span had improved, as had her insight and judgment. (*Id.*)

Plaintiff was discharged to her home in Moorhead on January 19, 2005.  (Tr. 166.)  She was referred to a psychiatrist,  Dr. Ahmed Dokmak, a psychologist Dr. Jennifer Lees, a Rule 79 case worker, Kristin Wegenast, and a financial worker at Clay County Social Services.  (*Id.*)

Plaintiff met with Dr. Lees on January 20, 2005.  (Tr. 241.)  Plaintiff expressed concerns

about getting a job to Dr. Lees.  (*Id*.)  Dr. Lees described Plaintiff's thought processes as "logical and mostly coherent."  (*Id*.)  Plaintiff met with Dr. Dokmak on January 27, 2005.  (Tr. 238.)  He described her as "cooperative and pleasant" and her concentration and attention were "good." (*Id*.) He noted that she did not exhibit evidence of thought problems and she was coherent and goal-directed.  (*Id*.)  He also noted that she had no evidence of responding to internal stimuli and she appeared to have good insight and judgment at that time.  (*Id*.)

When Plaintiff again met with Dr. Dokmak on May 17, 2005, she stated that she had been doing much better.  (Tr. 236.)  She stated that she had been her normal self and she is pleased that the medications are working.  (*Id*.)  She denied any problems with side effects from the current medications.  (*Id*.)

Plaintiff also met with Dr. Lees on May 17, 2005.  (Tr. 235.)  Plaintiff told Dr. Lees that she had been feeling quite a bit better and reported an increased energy level.  (*Id*.)  Plaintiff told Dr. Lees that she was starting a new job that afternoon cleaning houses and hoped to make about $400 per week.  (*Id*.)  Dr. Lees described Plaintiff has having logical and coherent thought processes and having good insight.  (*Id*.)

Plaintiff met with Dr. Lees again on May 31, 2005.  (Tr. 234.)  Plaintiff discussed her disappointment with her friends since she left the hospital.  (*Id*.)  She stated that none of her friends, not even her best friend, have contacted her since she got out of the hospital.  (*Id*.)  She had been angry and disappointed about this.  (*Id*.)  She also stated that she was making progress slowly with her daughter.  (*Id*.)

Plaintiff met with Dr. Dokmak on July 1, 2005 and he reported that she was doing well; that she denied problems with her medications.  (Tr. 233.)  Dr. Dokmak wrote Plaintiff prescriptions for

her current medications of lithium, Seroquel, Topamax and Synthroid. (*Id.*) When Plaintiff met with Dr. Dokmak on August 5, 2005, he reported that she was exercising regularly, that she enjoys pleasurable activities and that she is tolerating her medications well. (Tr. 232.) Plaintiff again met with Dr. Dokmak on September 23, 2005 and he reported that she was able to enjoy pleasurable activities; that she stated she was not as tired as she used to be and is getting used to her medications; that she sleeps eight hours per night. (*Id.*) He also reported that she had a slight flight of ideas but concluded that her bipolar disorder was in "complete remission." (*Id.*)

### C.     Plaintiff's Testimony

On March 23, 2006, Plaintiff gave testimony pertaining to her impairments before the ALJ. (Tr. 269-319.) Plaintiff stated that she has been divorced for 11 years and that she has a 12 year old child. (Tr. 270.)

She testified that she has an associate's degree in networking but that she has difficulty reading because she has trouble concentrating. (Tr. 272.) Plaintiff did not, however, report difficulties using a telephone book, writing, doing simple math, or managing her own money. (Tr. 273.) Plaintiff stated that the last time she had worked was in July of 2005. (*Id.*) Plaintiff explained that she was a maid at the Motel 75 in Fargo for about five weeks when she was fired because she could not make the beds in the proper way. (Tr. 274.) Plaintiff thought she was doing a good job and felt bad that they did not appreciate her work. (Tr. 281.) Prior to that job, Plaintiff worked for two days as a telemarketer and was fired because her supervisor was annoyed by her loud voice. (Tr. 275.) Plaintiff also previously worked another telemarketing job but was fired after four months. (*Id.*)

From December of 2001 until February of 2004, Plaintiff said she worked as a children's

activities director.  (Tr. 277.)  This job was thirty hours per week.  In the mornings, she worked as a secretary and in the afternoon she planned activities for the children.  (Tr. 278.)  Plaintiff stated that she was a cosmetics clerk in 1989 after she finished high school for about six months.  (*Id.*)  She was let go from that job because she was hired only to work the holiday season.  (*Id.*)  Plaintiff testified that she also worked as a customer service clerk for Blue Cross/Blue Shield from December of 1990 until March of 1992.  (Tr. 279.)  She testified that after that job, she worked as a daycare director, a customer service agent at an insurance company and as a telemarketer.  (Tr. 279-80.)

Plaintiff stated that she currently could not do any of the jobs she had done in the past because she cannot concentrate, her concentration is "shot."  (Tr. 280.)  She stated that she has had problems with concentration since around two years before she went into the hospital.  (*Id.*)  Plaintiff first noticed this problem when she was writing the bulletin and newsletter for the day care center.  (*Id.*)  She stated that the other secretary would have to edit the bulletin and the newsletter every time the Plaintiff wrote them.  (*Id.*)

Plaintiff said that she did not have any physical problems that would interfere with work.  (Tr. 281.)  Plaintiff does have a problem with anemia but she takes monthly shots which help.  (Tr. 282.)  She also receives vitamin B-12 shots.  (*Id.*)  She has been getting these shots since her first hospitalization in December of 2003.  (*Id.*)

The Plaintiff described her bipolar disorder as primarily manic but noted that she also gets depressed to the point where she cannot move.  Plaintiff stated that in 2003, she was 100 percent manic; in 2004 she was 80 percent manic, 20 percent depressed.  (Tr. 283-84.)

Plaintiff testified that her ex-boyfriend could not be in the same room with her when she was manic because he could not "bear the energy."  (Tr. 284.)  She stated that she skips from subject to

9

subject; that her thoughts race until they get so out of control that she needs to be hospitalized.  (Tr. 285.)  Plaintiff said that when she is manic, she makes bad decisions like driving her car when it does not have any gas.  (Tr. 286.)   Plaintiff did, however, deny that she engages in drinking, gambling, drugs or unusual sexual behavior when she is manic.  (Tr. 286-87.)

When Plaintiff is depressed, she feels physically drained.  (Tr. 296.)  She stated that she had tried methamphetamine a few times and after doing the drug, she felt so guilty that she had to be hospitalized.  (Tr. 299.)

Plaintiff testified that she is currently taking lithium, Seroquel, Topamax and a medication for her thyroid.  (Tr. 287.)  She testified that the Seroquel makes her sleepy.  (Tr. 288.)  Plaintiff did state, however, that taking Seroquel allows her to get a full night's sleep.  (Tr. 289.)  Plaintiff admitted that she was hospitalized in October of 2004 because she went off of her medications.  (Tr. 305.)  Plaintiff stated that when she was in the hospital, she excessively exercised because she was afraid that the Seroquel would make her sleepy.  (Tr. 317.)

She stated that her psychiatrist is Dr. Ahmed Dokmak and she sees him once per month.  (Tr. 290.)   She also sees a case manager, Cheryl Myers.  (*Id.*)

Plaintiff testified that she had not had any friends since she was diagnosed as being bipolar.  (Tr. 290.)  She stated that she does not want to isolate herself but she finds that she is doing so anyway.  (Tr. 295.)

Plaintiff stated that she has problems concentrating.  (Tr. 292.)  She stated that her mind frequently wanders when someone is talking to her.  (*Id.*)  She does not like to watch television and she does not read for pleasure.  (Tr. 292.)  She does, however, play games and puts puzzles together with her daughter from time to time.  (Tr. 293.)

10

Plaintiff stated that she usually gets up at 8:00 a.m. and walks for an hour and a half.  (Tr. 306.)  She cleans the house and cooks food for herself,  makes her own bed, takes out the garbage, does a load of laundry every day, washes the dishes.  (Tr. 308-09.)  She stated that she also "thinks" for an hour.  (Tr. 307-08.)  Plaintiff testified that she consistently showers and dresses herself.  (Tr. 308.)  Plaintiff stated that she does not attend church other than on Christmas and does not belong to any clubs or social organizations. (Tr. 310.)  She does however enjoy attending family events. (Tr. 311.)  She stated that she drives without problems.  (*Id*.)

When asked about the circumstances at the Target store leading to Plaintiff's hospitalization, she stated that the incident felt "unreal" and she acknowledged that she had to go to the hospital because "things did not look real" to her.  (Tr. 314.)  She denied using drugs at the time of this incident.  (Tr. 316.)

Plaintiff stated that she currently lives on child support of $346 per month, food stamps of $278 per month, and housing assistance.  (Tr. at 276-77.)  She is on medical assistance as well.  (*Id*.)

Plaintiff agreed to get a blood test done and to submit it to the ALJ as evidence in his determination of whether or not Plaintiff was taking her medication.  (Tr. 319.)

### D.    Vocational Expert's testimony

VE David Samalska also testified at the hearing on March 23, 2006.  (Tr. 321.)   The ALJ posed the following hypothetical to the VE:

> We have an individual less than age 50.  She possesses 14 years of education . . . Let's assume she possesses no physical limitations to work activity whatsoever.  From a mental standpoint, she's able to understand, remember and carry out only very short, simple instructions.  She's able to interact appropriately with the public on a never basis. In other words, no interaction with the public but she is able to interact with supervisors and coworkers on a very brief and superficial basis only.  And she's able to

respond appropriate[ly] to changed in a routine work setting only.

(Tr. at 323.)  The VE concluded that a person with the above characteristics could not perform any of Plaintiff's past work (Tr. 324.) but could do other jobs including being a dishwasher (8,000 such jobs exist in Minnesota), a housekeeper (5,500 jobs exist in Minnesota), or a supply worker/clerk (4,000 jobs exist in Minnesota).  (Tr. 324.)

The second hypo posed was: "assume the same individual from a vocational profile standpoint and let's assume that I accept her testimony today as credible."  (Tr. 325.)  The VE concluded that such a person would not be able to do any work because the testimony demonstrated a lack of concentration, persistence and pace which would rule out any substantial gainful employment.  (Tr. 325.)

### E.    The ALJ's Decision

In determining whether the Plaintiff was disabled, the ALJ followed the five-step process outlined in 20 C.F.R. 416.920(a).  First the ALJ determined that there was insufficient evidence of disqualifying gainful activity, and thus the claim could not be denied due to work activity.  (Tr. 14.) The ALJ noted that Plaintiff had worked for five weeks in 2005 as a motel housekeeper but was fired because she could not do the job properly.  (*Id*.)  He also noted that she had started a job as a telemarketer but was fired after two days.  (*Id*.)  He considered both of these jobs to be unsuccessful work attempts.  (*Id*.)

Second, the ALJ evaluated whether Plaintiff was subject to any severe medically determinable impairments which limit Plaintiff's ability to perform basic work activities.  (Tr. at 13.) The ALJ concluded that Plaintiff had a severe impairment, bipolar disorder.  (Tr. 14.)  The ALJ concluded that Plaintiff's chronic anemia, which was treated with monthly vitamin B12 shots, was

not severe. (Tr. 15.)

Third, the ALJ determined that although Plaintiff's bipolar disorder was severe, it was not severe enough to meet or medically equal, one of the impairments listed in 20 C.F.R. part 404, Subpart A, Appendix 1 (20 C.F.R. 416.920 (d), 416.925 and 416.926). The ALJ evaluated Plaintiff's symptoms under section 12.04 of the Appendix and concluded that Plaintiff had only mild limitations in her activities of daily living, moderate limitations in social functioning, moderate limitations in concentration, persistence and pace, and no episodes of decompensation. (Tr. 15.) He found that there was no evidence of Part C criteria. He further noted that no doctor has concluded that the Plaintiff meets the requirements of any listed impairment. (*Id.*)

Next, the ALJ determined whether the Plaintiff retained the RFC to perform the requirements of her past relevant work or other work existing in significant numbers in the national economy. (*Id.*) The ALJ concluded that Plaintiff can perform a full range of physical work; that from a mental standpoint, she retains the ability to work eight hours per day, five days per week. (*Id.*) He concluded that she is able to understand, remember and carry out short and simple instructions; that she can interact appropriately with supervisors and co-workers on a very brief and superficial basis; and that she can respond appropriately to changes in a routine work environment. (*Id.*) The ALJ also concluded that Plaintiff is not able to interact appropriately with the public and must avoid all contact with the public. (*Id.*)

In reaching the above conclusion, the ALJ noted that claimant reports difficulty in concentration, problems following directions, low energy, feelings of depression. (*Id.*) He also noted that she reported problems with her memory, completing tasks and concentration and that she can only pay attention for 20 minutes. (*Id.*) He finally noted that Plaintiff reported that she does

not handle changes in routine well.  (*Id.*)

The ALJ found it significant that Plaintiff lived with her daughter, could care for herself and the household appropriately, worked out daily, could drive, shop, pay bills, count change and handle her finances.  (Tr. 16.)  She admitted to getting along with family and others and had no change in social activities.  (*Id.*)  She stated she could follow written instructions and handle stress "somewhat well."  (*Id.*)  The ALJ concluded that Plaintiff had only mild restrictions in her activities of daily living.  (Tr. 18.)

The ALJ concluded that the claimant's statements concerning the intensity, duration and limiting effects of her symptoms are not entirely credible.  (Tr. 16.)  The ALJ noted that the Plaintiff's description of her symptoms and limitations had varied.  (*Id.*)  The ALJ pointed out that in the Plaintiff's initial application, she reported that she was generally able to complete most activities and did not report any limitations.  (*Id.*)  In subsequent appeals, she reported time periods of depression.  (*Id.*)  At the hearing, the Plaintiff described these periods of depression as not happening frequently and of a short duration.  (*Id.*)  Because Plaintiff's description of her symptoms had been unreliable, the ALJ placed more weight on objective signs and findings, treatment history and activities of daily living.  (*Id.*)

The relevant time period regarding Plaintiff's condition started on April 25, 2005.  The ALJ reasoned that Plaintiff had been hospitalized several times prior to April 25, 2005, but since this date, she has been doing much better.  (Tr. 17.)  She is taking medication and does not experience psychotic symptoms.  (*Id.*)  Plaintiff reported that she was sleeping between 8-10 hours per night in May and August of 2005 and made only intermittent reports of side effects from the medication.  (*Id.*)  The ALJ concluded that because the reports of side effects had only been intermittent and there

were no reports of them in the most recent records, that they have not caused her significant limitations.  (*Id*.)  The ALJ noted that the Plaintiff's psychiatrist determined that her bipolar disorder was in full remission in September 2005.  (*Id*.)

The ALJ concluded that Plaintiff's lack of income in a number of years preceding her application is not a positive factor in her favor.  (*Id*.)

The ALJ concluded that Plaintiff had mild restrictions in social functioning.  (Tr. 18.)  In making this conclusion, the ALJ reasoned that the Plaintiff spends time with her family and her daughter and is able to get along with people in her activities of daily living such as shopping.  (*Id*.)  The ALJ did note that Plaintiff stated that she did not have any friends and that she isolates herself. (*Id*.)

The ALJ concluded that Plaintiff had moderate difficulties in maintaining concentration persistence and pace, reasoning that Plaintiff was able to complete household chores, drive, care for her daughter and do other activities of daily living.  (*Id*.)

Lastly, the ALJ concluded that there have been no periods of decompensation in work or work-like settings during the relevant time period.  (*Id*.)

The ALJ concluded that there was no evidence of "C" criteria which are repeated episodes of decompensation.  (*Id*.)  The ALJ reasoned that the Plaintiff has not demonstrated a current history of one or more years of an inability to live outside a highly supportive environment or evidence that any increase in mental demands would cause her to decompensate.  (Tr. 19.)

The ALJ noted that Plaintiff's behavior at the hearing was manic-like in that she was tangential and had difficulty staying on task.  (*Id*.)  Nevertheless, the ALJ reasoned that Plaintiff's medical records indicate that she is doing well and it was noted she was in full remission in

September 2005.  (*Id*.)  She, furthermore, is able to be a parent to her child without notable involvement with social services.  (*Id*.)  The ALJ therefore concluded that despite the Plaintiff's behavior at the hearing, her medical records and activities of daily living indicate that she is functioning rather well.  (*Id*.)

Lastly, relying on the Plaintiff's RFC and the VE's testimony, the ALJ determined that the Plaintiff could not perform past relevant work.  He, therefore, asked the VE whether a hypothetical individual with similar limitations as the plaintiff could perform any other work that existed in significant numbers.  (Tr. 20.) Based on the VE's testimony that the hypothetical person could in fact perform work that existed in significant numbers, the ALJ found Plaintiff not to be under a "disability" as defined by the Social Security Act.  (*Id*.)

### III.  STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole.  *See* 42 U.S.C. § 405(g); *see also Qualls v. Apfel*, 158 F.3d 425, 427 (8th Cir.1998); *Gallus v. Callahan*, 117 F.3d 1061, 1063 (8th Cir.1997); *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir.1989).  Substantial evidence means more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co., v. NLRB*, 305 U.S. 197, 220 (1938)).  In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight.  *See Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir.1999); *see also Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir.1989) (citing *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision. *See Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir.2000); *see also Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir.1996). "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently." *Roberts v. Apfel*, 222 F.3d at 468. (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir.2000); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir.1993)). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.* Therefore, our review of the ALJ's factual determinations is deferential, and we neither re-weigh the evidence, nor review the factual record de novo. *See Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir.1997); *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir.1996). The Court must "defer heavily to the findings and conclusions of the SSA." *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir.2001).

Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In making the disability determination the Secretary promulgated a sequential evaluation process which applies to both physical and mental disorders. 20 C.F.R. §404.1520 outlines the five-step sequential process used by the ALJ to determine whether a claimant is disabled. The disability determination requires a step-by-step analysis. *See* 20 C.F.R. §404.1520(a). At the first step, the ALJ must consider Plaintiff's work history. At the second step, the ALJ must consider the medical severity of Plaintiff's impairments. At the third step, the ALJ must consider

whether Plaintiff has an impairment or impairments that meet or equals one of the listings in Appendix 1 to Subpart P of the regulations. *See* 20 C.F.R. 404.1520(d). If Plaintiff's impairment does not meet or equal one of the listings in Appendix 1, then the ALJ must make an assessment of Plaintiff's residual functional capacity and Plaintiff's past relevant work. If the ALJ determines that the claimant can still perform his or her past relevant work, the ALJ will find that the claimant is not disabled. If the claimant cannot perform his or her past relevant work, then the "burden shifts to the Commissioner to prove, first, that the claimant retains the [RFC] to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy." *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir.2000).

## IV.  CONCLUSIONS OF LAW

**There is substantial evidence in the record to support the ALJ's conclusion regarding Plaintiff's residual functional capacity.**

The ALJ's conclusion that Plaintiff can perform jobs that exist in significant number in the national economy is supported by the testimony of a vocational expert who testified in response to a properly phrased hypothetical question. The ALJ concluded that the Plaintiff is able to understand, remember and carry out very short and simple instructions and based that conclusion on the claimant's activities of daily living. (Tr. 19.) There is extensive evidence in the record that Plaintiff functions well in her activities of daily living in that she cares for her daughter, cooks, cleans, exercises, drives and is able to manage her finances. (Tr. 232, 233, 273, 307-09.) The ALJ concluded that the Plaintiff was able to interact appropriately with supervisors and co-workers on a very superficial basis but must avoid contact with the public. (Tr. 19.) The ALJ based this on Plaintiff's behavior at the hearing and reports of isolation and limited contact with others. (*Id*.) The

ALJ noted at the hearing that the Plaintiff was tangential and having some difficulties staying on task (Tr. 319) but ultimately concluded that Plaintiff was still able to work because her treating physician reported that her bipolar disorder is in full remission (Tr. 231, 232) and she is able to live independently and care for her child.  (Tr. 19.)   The ALJ concluded that the Plaintiff is able to respond appropriately to changes in the work environment because she is able to manage a household and care for her child.  (Tr. 19, 271, 308-09.))  The ALJ concluded that the Plaintiff had no physical limitations.  (Tr. 20.)  At the hearing, the Plaintiff stated that she did not have any physical problems that would interfere with work. (Tr. 281.)  Both State Agency medical consultants found that Plaintiff's only physical impairment was chronic anemia due to gastric bypass surgery which they considered non-serious.  (Tr. 214-16, 243-45.)  Further, Plaintiff treated the condition with monthly shots of vitamin B12. (Tr. 282.)

The ALJ incorporated these conclusions into a properly phrased hypothetical question:

We have an individual less than age 50.  She possesses 14 years of education . . . Let's assume she possesses no physical limitations to work activity whatsoever. From a mental standpoint, she's able to understand, remember and carry out only very short, simple instructions.  She's able to interact appropriately with the public on a never basis. In other words, no interaction with the public but she is able to interact with supervisors and coworkers on a very brief and superficial basis only. And she's able to respond appropriate[ly] to changed in a routine work setting only.

Because the hypothetical corresponded to Plaintiff's impairments as determined by the ALJ, the hypothetical was proper.  The VE testified that Plaintiff could perform jobs that exist in significant numbers in the economy.  In particular, the VE identified three jobs that the Plaintiff could perform: dishwasher (8,000 such jobs exist in Minnesota), a housekeeper (5,500 jobs exist in Minnesota), or a supply worker/clerk (4,000 jobs exist in Minnesota).  A VE's conclusions based on a properly phrased hypothetical constitute substantial evidence in the record as a whole supporting the ALJ's

denial of benefits.  *Cruze v. Chater*, 85 F.3d 1320, 1326 (8th Cir. 1996).  The VE's testimony here constitutes substantial evidence on the record as a whole.

The Plaintiff contends that the ALJ's conclusion is not supported by substantial evidence in the record because the State Agency medical consultants who addressed Plaintiff's physical impairments did not consider Plaintiff's bipolar disorder.  (Pl. Br. at 9.)  However, the ALJ also had an assessment by a State Agency medical consultant who *solely* addressed Plaintiff's *mental* impairments.  (Tr. 217.)  Therefore, the failure of the medical consultants to address the Plaintiff's mental impairments does not in any way suggest that the ALJ's use of their reports indicates that his conclusions are not supported by substantial evidence in the record.

The Plaintiff also contends that the conclusions of the State Agency medical consultant who assessed Plaintiff's mental impairments are not credible.  (Pl. Br. at 9.)  Plaintiff takes issue with the consultant's conclusion that Plaintiff's mental impairments were not expected to last 12 months.  *See* 42 U.S.C. § 1382c(a)(3)(A) (defining disability, in part, as the inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months).  The Plaintiff argues that because medical records show that Plaintiff was hospitalized for a total eight months between December 2003 and January 2005, this evidence can only support a conclusion that Plaintiff's mental impairments will last more than 12 months.  (Pl. Br. at 9-10.)  Plaintiff's argument oversimplifies the issue.  Both the ALJ and the medical consultant concluded that the Plaintiff's condition was severe but that it was not disabling to the point where she was unable to work during the relevant period.

The relevant period of Plaintiff's functioning for determining whether Plaintiff was entitled

to SSI began on April 25, 2005, when the Plaintiff applied for SSI benefits. *See Cruse v. Bowen*, 867 F.2d 1183, 1185 (8th Cir. 1989) ("SSI benefits are not payable for a period prior to the application . . .")  As the ALJ noted in his opinion, the relevant time period in SSI cases starts with the date the SSI application was filed. *See id.*  Since April 25, 2005, the Plaintiff has not been hospitalized and has exhibited signs of marked improvement from the prior year.  Plaintiff met with Dr. Dokmak in May, July, August and September of 2005 and he reported that she was taking her medications and functioning well.  (Tr. 231, 232.)

The Plaintiff contends that the ALJ should have had a medical expert at the hearing rather than forming medical opinions of his own.  (Pl. Br. at 10.)  Plaintiff argues that "a competent and unbiased medical expert would not have found that an individual that was hospitalized this much had no periods of decompensation."  (*Id.*)  Again, the Plaintiff's alleged periods of decompensation occurred before the relevant time period beginning on April 25, 2005, when Plaintiff first applied for SSI benefits.  Futhermore, the ALJ is not required to obtain medical expert testimony provided the evidence in the record is sufficient to support his decision.  *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994).  In this case, Plaintiff's treating psychiatrist, Dr. Dokmak, concluded on August 5, 2005, and again on September 23, 2005, that Plaintiff's bipolar disorder was in "full remission." (Tr. 231-32.)  There is evidence in the record that Plaintiff functions well in her activities of daily living in that she cares for her daughter, cooks, cleans, exercises, and drives.  She also socializes relatively well with her family and daughter.  There is substantial evidence on the record supporting the ALJ's conclusion.

Finally, Plaintiff argues that the ALJ's RFC was not based on substantial evidence in the record because it did not take into consideration that "the medical records show that Ms. Humphrey

was hospitalized more than 60% of the time" and therefore would miss more than two days of work per month. (Pl. Br. at 11-12.) Therefore, the Plaintiff argues that because Plaintiff spent so much time in the hospital, she will not be able to perform unskilled work "within competitive expectations." (Pl. Br. at 12.) The ALJ did note that Plaintiff had been hospitalized. (Tr. 17.) However, Plaintiff's hospitalization did not occur in the relevant time period for determination of whether or not Plaintiff is entitled to SSI benefits. The ALJ reasonably concluded that the Plaintiff would be able to perform unskilled work full-time based on Plaintiff's improvement in her condition since she was hospitalized. (Tr. 17.) Because the Plaintiff's description of her symptoms was inconsistent, the ALJ appropriately gave more weight to Plaintiff's activities of daily living and objective signs and findings in addition to her improvement recorded in her treatment history.

## V. RECOMMENDATION

Based on the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment [# 10] be **DENIED**; and

2.      Defendant's Motion for Summary Judgment [# 13] be **GRANTED**.

DATED: February 15, 2008                    s/ *Franklin L. Noel*
                                            FRANKLIN L. NOEL
                                            United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **March 5, 2008**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.